ARTHUR C. SMITH, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARTHA T. SMITH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 539–76, 540–76.     Filed August 14, 1978.

*John J. Yurow* and *John Harllee, Jr.*, for the petitioners.
*Steven J. Mopsick*, for the respondent.

---

DAWSON, *Judge:* In these consolidated cases respondent determined deficiencies of $329,992.55 and $10,672.98 in petitioners' Federal income tax for the years 1971 and 1972, respectively. The issues for our decision are:

(1) Whether petitioner Arthur C. Smith, Jr., received constructive dividends as a result of corporate redemptions of stock for which he had an unconditional obligation to purchase from his father's estate.

(2) Whether petitioner Arthur C. Smith, Jr., received constructive dividends as a result of corporate redemptions of stock owned by his sister's estate and her children.

(3) Whether section 6013(e)[1] applies to relieve petitioner Martha T. Smith from liability if any tax is due as a result of the stock redemptions.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Arthur C. Smith, Jr. (hereinafter Arthur Smith), and Martha T. Smith (hereinafter Martha Smith), husband and wife, resided in Washington, D.C., at the time their petitions were filed in these cases. Petitioners filed joint Federal income tax returns on the cash receipts and disbursements method of accounting for the calendar years 1971 and 1972 with the Internal Revenue Service Center, Philadelphia, Pa.

Arthur Smith's father was Arthur C. Smith, Sr. (hereinafter the senior Mr. Smith). The senior Mr. Smith had one other child, Mrs. Elizabeth S. Fullilove (hereinafter Mrs. Fullilove). Mrs. Fullilove had two children, Donald M. Lathrom, Jr. (hereinafter Donald Lathrom), and Mrs. Patricia Lathrom Enright (hereinafter Patricia Enright), both of whom were adults during the years in issue.

During the senior Mr. Smith's lifetime he operated, through various corporations, a successful and well-known moving and storage business in the greater Washington, D.C., area. Arthur Smith joined his father in the family business upon his return from military service after World War II. Arthur Smith became

---

[1]Unless specified otherwise, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.

the general manager of the business and a director and vice president of several of the family corporations. During the 1950's he became president of the family corporations. Mrs. Fullilove worked from time to time for the family corporations and took an active interest in the family business. In later years she was a vice president of the Smith companies. Charles P. Muldoon (hereinafter Muldoon) was Mrs. Fullilove's personal attorney and served as a director for several years during the mid–1960's. John L. Schroeder (hereinafter Schroeder) was general counsel to the family business from 1950 until 1974, and also acted as personal counsel to the senior Mr. Smith and his son.

### The 1960 Stock Purchase Agreement

During his lifetime the senior Mr. Smith made gifts of stock in the various family corporations to his children and grandchildren, but retained ownership of a majority of the voting stock in the operating companies. The senior Mr. Smith wanted his children to be treated equally after his death in terms of the value of what he left them, but also wanted his son to have control of the family business. To achieve the senior Mr. Smith's objectives, Schroeder prepared a stock purchase agreement (hereinafter referred to as the 1960 stock purchase agreement), which the senior Mr. Smith and Arthur Smith executed in August 1960.

The 1960 stock purchase agreement concerned the stock of nine family corporations. After mergers and name changes, the corporations which survived and are pertinent to this matter are: the principal operating company, Smith's Transfer & Storage Co., Inc. (hereinafter Transfer & Storage); Smith's Storage Insurance Agency, Inc. (hereinafter Insurance); and two real estate holding companies, Bladensburg Development Co., Inc. (hereinafter Bladensburg), and Champlain Development Co., Inc. (hereinafter Champlain).

Relevant portions of the 1960 stock purchase agreement follow:

4. Upon the death of either stockholder, the survivor shall purchase and the estate of the decedent shall sell the stock interest now owned or hereafter acquired by the stockholder who is the first to die. The purchase price of such interest shall be computed in accordance with the provisions of paragraph 5 of this agreement.

5. The value of the outstanding capital stock of the companies listed in paragraph 3 for the purpose of this agreement shall be their respective book values as of the end of the month in which the death of the stockholder occurs. The determination of the book value shall be made by the accountant then servicing the company and said book value shall be subject to an adjustment for appreciation of real estate over the book value of such real estate as listed on the companies' books and such determination of said accountant shall be conclusive on all parties. If there is no such accountant available or if he fails to make a determination of such valuation, then the value shall be determined by any other accountant who may be selected by mutual agreement of the surviving stockholder and the legal representative of the deceased stockholder.

6. The purchase price as set forth above shall be paid in 120 consecutively [sic] monthly payments beginning three months after the date of the decedent's death. The unpaid balance of the purchase price shall be evidenced by a series of negotiable promissory notes made by the surviving stockholders [sic] to the order of the estate of the deceased with interest at 5% per annum. Said notes shall provide for the acceleration of the due date of all unpaid notes in the series on default in the payment of any note or interest thereon and shall give the maker thereof the option of pre-payment in whole or in part at a time [sic]. All of the stock of the decedent covered by this agreement shall be pledged with the decedent's estate as security for the payment of said notes, provided, however, that the surviving stockholder shall be entitled to exercise all rights of ownerships [sic] in such stock prior to default in the payment of any note or interest thereon.

Elizabeth Fullilove was not a party to the 1960 stock purchase agreement because her father did not want her to be aware of its existence. She never did learn of its existence. The 1960 stock purchase agreement contained the following provisions concerning her stock and that of her heirs in the Smith corporations:

8. Upon the death of either stockholder, the survivor shall purchase the stock interests now owned or hereafter acquired by Elizabeth Smith Fullilove or her heirs, if the said Elizabeth Smith Fullilove or her heirs request the surviving stockholder to this agreement to purchase all of the stock interests now owned or hereinafter acquired by said Elizabeth Smith Fullilove or her heirs. The obligation set forth in this paragraph to purchase the stock interests of Elizabeth Smith Fullilove or her heirs shall apply to said stock interests in their entirety and not to any individual divisions of said stock interests and the entire obligation shall expire at the end of ten years following the death of the first stockholder to die who is party to this agreement.

9. The value of the outstanding capital stock of the companies owned by Elizabeth Smith Fullilove or her heirs shall be [the] respective book values as of the end of the month in which she or her heirs request that the surviving stockholder purchase said stocks. The determination of the book value shall be made by the accountant then servicing the company and said book value shall be subject to an adjustment for appreciation of real estate over the book value of such real estate as listed in the companies' books and such determination of said accountant shall be conclusive on all parties. If there is no such accountant

available or if he fails to make a determination of such valuation, then the value shall be determined by any other accountant who may be selected by mutual agreement of the surviving stockholder to this agreement and Elizabeth Smith Fullilove or her heirs. In no event shall the price or valuation of the stock of Elizabeth Smith Fullilove be less than the "Estate Tax Valuation" price of stock as determined by and/or accepted by the Internal Revenue Service on the estate of the party to this agreement who is the first to die.

10. The purchase price as set forth above as to the stock of Elizabeth Smith Fullilove or her heirs shall be paid in 120 consecutive monthly payments beginning three months after the date of the request by Elizabeth Smith Fullilove or her heirs that the surviving stockholder purchase her stock of the companies listed in paragraph 3. The unpaid balance of the purchase price shall be evidenced by a series of negotiable promissory notes made by the surviving stockholder to Elizabeth Smith Fullilove or her heirs with interest at 5% per annum. Said notes shall provide for the acceleration of the due date of all unpaid notes in the series on default in the payment of any note or interest thereon and shall give the maker thereof the option of prepayment in the whole or in part at the [sic] time. All of the stock of Elizabeth Smith Fullilove or her heirs covered by this agreement shall be pledged to Elizabeth Smith Fullilove or her heirs as security for the payment of said notes, provided, however, that the surviving stockholder purchasing said stock shall be entitled to exercise all rights of ownership in such stock prior to default in the payment of any note or interest thereon.

In summary, the 1960 stock purchase agreement unconditionally required upon the death of either Arthur Smith or the senior Mr. Smith the sale of the stock of the deceased to the survivor. The agreement further provided that the survivor must purchase the stock interests of Mrs. Fullilove or her heirs but only if so requested by them within 10 years of the death of Arthur Smith or his father, whichever occurred first. The agreement provided the terms for these sales and a method for determining price by adjusting book value by unrealized appreciation in corporate real estate as determined by the accountant then servicing the company.

### The Fullilove Estate

Elizabeth Fullilove predeceased her father. She died on January 31, 1968. Her will divided her entire estate equally between Donald Lathrom and Patricia Enright. The only significant assets of her estate (hereinafter the Fullilove estate) were her shares of stock in the Smith corporations. Muldoon was the executor of the Fullilove estate. He was assisted by Austin

Doyle (hereinafter Doyle), a certified public accountant who was an employee of the law firm to which Muldoon was "of counsel."

Muldoon believed the Fullilove estate would need cash to pay taxes and administration expenses. As a temporizing measure, the original Federal estate tax return for the Fullilove estate was filed on a basis that showed no liability for tax. On June 20, 1969, without disclosure of the 1960 stock purchase agreement, Schroeder and Muldoon met and discussed the possibility of the Fullilove estate selling its stock in the Smith corporations to raise the needed cash. On July 18, 1969, Schroeder sent Muldoon a letter setting forth an offer by the Smith corporations to redeem the stock held by the Fullilove estate for an aggregate price of $271,858, which reflected per share values for the Smith corporations of $612.31 for Transfer & Storage, $125.88 for Bladensburg, $104.94 for Champlain, and $19.97 for Insurance. The offer was not accepted.

### The Smith Estate

The senior Mr. Smith died a widower on June 30, 1969. Although some liquid assets were in his probate estate (hereinafter the Smith estate), the Smith estate had a need for cash, just as the Fullilove estate did, since the major assets were shares of stock in the Smith corporations. Each of these corporations had one class of stock outstanding except Transfer & Storage, which had both voting and nonvoting common stock. Immediately after the senior Mr. Smith's death, the outstanding shares of stock of the Smith corporations, an aggregate of 1,000 shares in each, were held as follows:

| | Number of shares | | | | |
| | Transfer & Storage | | | | |
| Shareholder | Voting common | Nonvoting common | Bladensburg | Champlain | Insurance |
|---|---|---|---|---|---|
| The Fullilove estate | 144.675 | 138.825 | 334.1 | 490 | 240 |
| Patricia Enright | 16.15 | --- | 60.0 | --- | --- |
| Donald Lathrom | 16.15 | --- | 60.0 | --- | --- |
| The Smith estate | 368.40 | --- | 91.8 | 20 | 520 |
| Arthur Smith | 144.675 | 138.825 | 334.1 | 490 | 240 |
| Custodianships for Arthur Smith's children | 32.30 | --- | 120 | --- | --- |

The senior Mr. Smith left a last will and testament dated May 22, 1968, and a codicil thereto dated July 18, 1968, both drafted by Schroeder. The will as modified by the codicil is hereinafter referred to as the 1968 will. The 1968 will provide a specific legacy to petitioner Arthur Smith of two shares of stock in each

of the Smith corporations to confer voting control on him. It left specific cash legacies of $1,000 to each of the Fullilove children and specific cash legacies of $3,000 to other persons. The residuary estate was divided as follows: 50 percent to Arthur Smith, 25 percent to Patricia Enright, and 25 percent to Donald Lathrom.

The executors nominated by the 1968 will were Schroeder and Arthur Smith. On July 31, 1969, they filed a petition for probate of the 1968 will with the United States District Court for the District of Columbia (hereinafter the Probate Court).

### The 1968 Will Contest and Subsequent Negotiations

Shortly after Schroeder and Arthur Smith filed the petition for probate of the 1968 will, Patricia Enright sought Muldoon's counsel. Muldoon expressed concern that under the 1968 will the Fullilove children would be relegated to the status of minority shareholders in closely held corporations, that they would be unable to exercise any influence over corporate affairs, and that no third party would be willing to buy their stock. Muldoon advised Patricia Enright to challenge the 1968 will, and brought in another attorney in his firm, Jeremiah C. Collins (hereinafter Collins), to represent her in the litigation. On August 12, 1969, Collins filed a complaint on behalf of Patricia Enright opposing probate of the 1968 will on the ground that the senior Mr. Smith had lacked testamentary capacity when he made the 1968 will. The complaint opposed the naming of Schroeder and Arthur Smith as executors and requested that a collector be appointed for the Smith estate. Donald Lathrom subsequently joined his sister as a plaintiff.

On September 11, 1969, Schroeder and Arthur Smith petitioned the Probate Court to appoint them as collectors of the Smith estate. Collins, on behalf of Patricia Enright, opposed their appointment. After a hearing on the matter, the Probate Court issued an order dated September 26, 1969, appointing the Union Trust Co. of the District of Columbia as collector of the Smith estate. Thereafter, the duties of Union Trust Co. (hereinafter the collector) as collector of the Smith estate were assigned to and performed by August Zinsser III (hereinafter Zinsser), an employee of the collector.

Schroeder orally advised Muldoon of the existence of the 1960 stock purchase agreement on September 12, 1969, and sent him a

copy on September 15, 1969. Subsequently, Schroeder unsuccessfully petitioned the Probate Court to vacate its appointment of the collector, at which time he filed with the Probate Court a copy of the 1960 stock purchase agreement and an affidavit by Schell S. Hoye (hereinafter Hoye), who had been the certified public accountant for the Smith corporations since 1961.

Hoye stated in his affidavit that pursuant to the 1960 stock purchase agreement he had made a determination of the value of the stock in the Smith corporations. The stock valuations as follow represent Hoye's determination of book value on June 30, 1969, increased by his valuation of appreciation in corporate real property:

| | Transfer & Storage | Bladensburg | Champlain | Insurance |
|---|---|---|---|---|
| Stockholders' equity | $296,180 | $117,287 | $3,959 | $37,307 |
| Increase in real estate | 438,378 | 90,616 | 253,962 | --- |
| Adjusted equity | 734,558 | 207,903 | 257,921 | 37,000 |
| Value per share | 734.558 | 207.903 | 257.921 | 37.000 |

After the existence of the 1960 stock purchase agreement was revealed, the parties' negotiations centered on it as a starting point for settling the matters in dispute. These negotiations were conducted by Schroeder and Hoye on behalf of Arthur Smith, and by Muldoon, Collins, and Doyle on behalf of the Fullilove children. Arthur Smith did not participate directly in the negotiations to any important extent, but Schroeder and Hoye from time to time kept him advised of their progress and obtained his views.

The 1960 stock purchase agreement contained negative features both for Arthur Smith and for the Fullilove children. Arthur Smith could not personally purchase the stock because he did not have the resources to pay the notes called for in the agreement. The Fullilove children's representatives did not want to sell the stock for personal notes of Arthur Smith because the Fullilove estate needed cash, because they considered the security provided in the 1960 stock purchase agreement to be inadequate, and because they believed that the 5-percent interest rate was too low. Further, they wanted the value of the corporate real estate to be determined by an appraiser rather than by the accountant for the corporations as required by the 1960 stock purchase agreement. Despite those negative features

of the agreement, both parties agreed with the ultimate objective of providing the Fullilove children with the economic value of their shareholdings and providing Arthur Smith with complete control of the corporations. For the foregoing reasons negotiations focused on finding an alternative method for selling the stock in which the Fullilove children had a beneficial interest, although neither side abandoned its rights under the 1960 stock purchase agreement.

Under the 1960 stock purchase agreement, Arthur Smith would have been obligated to purchase the stock held by the Fullilove estate and children only if requested to do so by the Fullilove children, as the legatees and owners of such stock, or possibly by Muldoon, as the executor of the Fullilove estate. The request could be made at any time within 10 years after the death of the senior Mr. Smith. No formal request was ever made. Instead, the parties operated under the implicit assumption that unless a different satisfactory arrangement was reached the Fullilove side would enforce the 1960 stock purchase agreement. Arthur Smith was therefore never unconditionally obligated to purchase the stock held by the Fullilove estate and children. Conversely, the Fullilove estate and children never became obligated to sell their stock to him and they remained free to sell their stock to a third party. The fact that the Fullilove estate and children could have exercised and sought enforcement of their rights under the 1960 stock purchase agreement, however, increased their bargaining power.

The negotiations, which were prolonged and difficult, were strongly influenced by the will litigation and surrounding circumstances which generated increasing pressures upon Arthur Smith and his representatives to reach a settlement. Muldoon, as executor of the Fullilove estate, and Zinsser, as the collector's representative, together controlled the majority of the voting stock of each of the Smith corporations, and occupied two of the three seats on the board of directors of each corporation with Arthur Smith holding the third. In general, Zinsser perceived the duties of the collector to be to marshal and preserve the assets of the Smith estate for the benefit of all persons claiming an interest therein, without taking sides between the claimants. Accordingly, initially he was neutral in the dispute between Arthur Smith and the Fullilove children.

As Zinsser familiarized himself with the business of the Smith

corporations and their shortages of working capital, however, he became increasingly disenchanted with Arthur Smith and the other operating managers of the business. Muldoon encouraged this view and sided with Zinsser on the board of directors. They frequently met privately to discuss corporate affairs. The two were generally allied in expressing dissatisfaction with the existing management and opposing actions which Arthur Smith wanted to take. This resulted in considerable friction between Muldoon and Zinsser on the one hand and Arthur Smith on the other. At some point the situation became so bad that there was concern that Muldoon and Zinsser might discharge Arthur Smith as president of the Smith corporations.

With respect to the negotiations themselves, the parties were at an impasse because of their inability to agree on the values to be assigned to the real estate owned by the Smith corporations. Muldoon and Doyle wanted to follow the approach set forth in the 1960 stock purchase agreement for valuing the stock of the corporations, that is, book value increased by unrealized appreciation in real estate. They were not willing, however, to accept Hoye's determination of the real estate values and insisted upon the employment of an appraiser.

During 1970, William A. Furman, Jr., an independent appraiser, was retained by mutual agreement of the Fullilove children, Arthur Smith, and the collector, to appraise the real properties owned by Transfer & Storage and Bladensburg. His appraisals (hereinafter the Furman appraisals) showed an aggregate value of $2,013,377 for the real properties owned by Transfer & Storage, and a value of $327,000 for the real property owned by Bladensburg. Arthur Smith's representatives did not agree with these valuations, in part because they did not believe the valuations reflected adequate consideration of the fact that the properties were located in neighborhoods which had been adversely affected by the riots that occurred in 1968.

The real property owned by Champlain was sold under threat of condemnation in June 1970. Arthur Smith wanted to defer the tax on the gain realized on the sale of the Champlain property by investing the sales proceeds in other real estate then being leased by Transfer & Storage. Zinsser and Muldoon refused to permit the sale proceeds to be used for such purpose or even to permit such proceeds to be used for operating capital, which instead had to be borrowed.

In December 1970, Zinsser wrote a letter to Schroeder advising him that the collector intended to seek performance of Arthur Smith's obligation under the 1960 stock purchase agreement to purchase the stock held by the Smith estate, with the price to be Hoye's determination of book value adjusted to reflect the Furman appraisals and the actual selling price of the property owned by Champlain. It was decided to resist performance, in major part because Arthur Smith would have been financially unable to make payments on the note he would have had to give. In January 1971, Schroeder responded to Zinsser's letter by denying that the collector had any authority to act under the agreement, noting that it provided for the price to be determined by the accountant and for the sale to be carried out by the executor.

On February 16, 1971, the collector filed a motion in the Probate Court for authority to bring a civil action against petitioner Arthur Smith to enforce the 1960 stock purchase agreement for the benefit of the Smith estate. This had the effect of increasing the pressure on Arthur Smith to agree to a settlement. The required authority was ultimately granted by the Probate Court on August 24, 1971, but by that time the parties were approaching settlement and no such civil action was ever instituted. At no time did the Fullilove estate seek authority to exercise or enforce its rights under the 1960 stock purchase agreement.

By this time a number of devices had been proposed at various points in the negotiations as elements of a settlement, including purchase of stock by Arthur Smith personally, liquidation of the real estate holding companies, corporate redemption, a sale-leaseback in lieu of paying cash, and division of the stock of the real estate holding companies equally between the two sides. At a late state in the negotiations Muldoon unsuccessfully sought to persuade Zinsser to agree to a liquidation of Transfer & Storage, the operating company.

## The 1971 Settlement and Its Aftermath

The impasse on valuation of the real estate was resolved in June 1971 by using lower real estate values than the Furman appraisals to establish the price for the stock, but by providing for additional amounts to be payable in the future if the properties were subsequently sold or appraised at greater

values. This concept was articulated in a letter dated June 16, 1971, from Hoye to Doyle which proposed to redeem the stock in which the Fullilove children had a beneficial interest. The proposal was accepted by letter dated July 2, 1971, from Collins to Schroeder.

Hoye analyzed the possible effect of performance of this agreement upon the Smith corporations' ability to continue their business operations and to meet their obligations in light of their history of cash flow problems. Hoye advised Arthur Smith that, in his judgment, the corporations would have a difficult time but that with sound management they could survive and continue in business. Arthur Smith agreed with this judgment and viewed the settlement as necessary to relieve dissension on the board of directors since he was financially unable to buy the stock personally. Although the discord in management was a factor, it was incidental to the primary reason the redemptions were undertaken by the corporations which was the inability of Arthur Smith to purchase the stock.

The agreement thus reached was subsequently set forth in more detail, but without significant substantive change, in an agreement dated September 3, 1971, and an updated supplemental agreement in respect of property valuation, incorporated therein by reference. The two documents will hereinafter be jointly referred to as the 1971 settlement agreement. The collector did not participate in the Smith corporations' vote to purchase the stock; instead he simply went along with the settlement reached by the parties.

The 1971 settlement agreement provided for the redemption of all stock in the Smith corporations owned by the Fullilove children, directly and indirectly, as follows:

(a) Subject to the terms and conditions herein set forth, Sellers hereby transfer, and [Transfer & Storage] hereby acquires, all of the issued and outstanding shares of [Transfer & Storage] Common Stock owned by Sellers in exchange for the consideration payable as follows:

| | Shares sold hereby | Cash consideration | Consideration paid by note |
|---|---|---|---|
| Patricia Lathrom Enright | 16.15 shares | $18,473.27 | --- |
| Donald M. Lathrom | 16.15 shares | 18,473.27 | --- |
| Executor of Fullilove estate | 283.50 shares | 24,283.18 | $300,000 |
| Coexecutors of Smith estate | 183.20 shares | 9,554.42 | 200,000 |

(b) Subject to the terms and conditions herein set forth, Sellers hereby

transfer, and Insurance hereby acquires, all of the issued and outstanding shares of Insurance Common Stock owned by Sellers in exchange for the consideration payable as follows:

|  | Shares sold hereby | Cash consideration |
|---|---|---|
| Executor of Fullilove estate................... | 240 shares | $8,964.00 |
| Coexecutors of Smith estate................. | 259 shares | 9,673.65 |

(c) Subject to the terms and conditions herein set forth, Sellers hereby transfer, and Bladensburg hereby acquires, all of the issued and outstanding shares of Bladensburg Common Stock owned by Sellers in exchange for the consideration payable as follows:

|  | Shares sold hereby | Cash consideration |
|---|---|---|
| Patricia Lathrom Enright....................... | 60 shares | $8,980.74 |
| Donald M. Lathrom.............................. | 60 shares | 8,980.74 |
| Executor of Fullilove estate................ | 334.1 shares | 50,007.75 |
| Coexecutors of Smith estate................ | 44.9 shares | 6,720.59 |

(d) Subject to the terms and conditions herein set forth, Sellers hereby transfer, and Champlain hereby acquires, all of the issued and outstanding shares of Champlain Common Stock owned by Sellers in exchange for the consideration payable as follows:

|  | Shares sold hereby | Cash consideration |
|---|---|---|
| Executor of Fullilove estate................... | 490 shares | $172,931.29 |
| Coexecutors of Smith estate.................... | 9 shares | 3,176.29 |

The price per share reflected in the 1971 settlement agreement was determined by the following computation:

|  | Transfer & Storage | Bladensburg | Champlain | Insurance |
|---|---|---|---|---|
| Book value ..................... | $306,381 | $120,953 | $3,959 | $37,350 |
| Appraisal increment ........... | 913,682 | 156,519 | 348,962 | --- |
| Negotiated adjustment....... | (76,207) | (127,793) | --- | --- |
| Adjusted net worth.......... | 1,143,856 | 149,679 | 352,921 | 37,350 |
| Value per share.............. | 1,143.856 | 149.679 | 352.921 | 37.350 |

The 1971 settlement agreement provided the following terms and security for the $300,000 of notes to be issued to the Fullilove estate and the $200,000 of notes to be issued to the Smith estate:

(c) "Smith Notes" shall mean the $500,000.00 aggregate principal amount notes (in the form attached hereto as Exhibit 1) of [Transfer & Storage] dated as of the Closing Date hereunder, having aggregate principal payments of $27,000.00 per year payable in equal monthly installments until April 1, 1990,

with interest payable monthly on the unpaid principal at the rate of 5 percent per annum until the first anniversary date of the Notes, $5\frac{1}{4}$ percent per annum thereafter until the second anniversary date of the Notes and an additional $\frac{1}{4}$ percent each year thereafter until the interest rate reaches $7\frac{1}{2}$ percent on the tenth anniversary date of the Notes, at which rate the interest shall remain until maturity.

\*     \*     \*     \*     \*     \*     \*

The unpaid principal of the Smith Notes shall be secured by

(i) a Second Deed of Trust on certain real properties owned by [Transfer & Storage] and described as 10576–10590 Metropolitan Avenue, Kensington, Maryland and 5600 Edsall Road, Alexandria, Virginia, naming Sellers as the noteholders and persons to be nominated by Sellers as the Trustees under the Second Deed of Trust in the form attached hereto as Exhibit A; (ii) the transfer in escrow of 468.70 shares of [Transfer & Storage] Common Stock owned by Arthur Clarendon Smith, Jr., pursuant to which transfer in escrow it is hereby further agreed, that prior to the final payment of principal on the Smith Notes, no further [Transfer & Storage] Common Stock may be issued to or owned by Arthur Clarendon Smith, Jr., his wife, any of his children, any nominee or trust or entity controlled by him without the prior written consent of Sellers Patricia Lathrom Enright and Donald M. Lathrom, and no dividends (x) in excess of net profits after taxes for the preceding taxable year or (y) in excess of an amount by which cumulative net after tax profits for all taxable years (including partial years) from the date of Closing to the date of payment of such dividends exceeds the sum of cumulative net after tax losses for all taxable years (including partial years) from the date of the Closing hereof to the date of the payment of such dividends plus the aggregate amount of dividends previously paid from the date of Closing hereof to the date of the payment of such dividends will be made; that the net worth of [Transfer & Storage] without regard to the accounting effect of this transaction, will not be permitted to fall below $200,000; and that [Transfer & Storage] will not make any intercompany loans to any of its affiliates without adequate security satisfactory to the assignees of the [Transfer & Storage] Common Stock; (iii) the assignment of $150,000 face amount of life insurance owned by [Transfer & Storage], assigned in a manner and form satisfactory to counsel for Sellers and providing that premiums on such life insurance are to be paid by [Transfer & Storage]. With respect to this provision [Transfer & Storage] shall, no later than 120 days after the end of each accounting year supply Donald M. Lathrom and Patricia Lathrom Enright with certified financial statements of [Transfer & Storage] and a certificate certifying that all premiums on the assigned life insurance policies have been paid. In the event that any of the provisions of any of the above are not complied with or if the [Transfer & Storage] net worth falls below $200,000, then the Smith Notes shall be considered to be in default and the assignees of the pledged [Transfer & Storage] Common Stock automatically shall assume forthwith full rights to vote all the stock so assigned.

The 1971 settlement agreement included the following

provisions concerning two real properties owned by Transfer & Storage and Bladensburg:

Now, THEREFORE, since the parties desire to insure that if the aforementioned properties upon which values were reduced are or could be sold at prices in excess of the reduced values mentioned above, Patricia Lathrom Enright and Donald Lathrom share 49.4% in the net proceeds of any sale or appraisal increment thereof, the following agreement is entered into.

1. Net proceeds from the sale of either property means the consideration received in settlement after subtracting therefrom the then unpaid balances of any mortgages or incumbrances existing and recorded against the property at the time this agreement is entered into and other customary expenses of sale and the reduced evaluations referred to above.

2. If a property is not sold and Patricia Lathrom Enright and Donald Lathrom so desire they can, by giving 120 days' notice to the other parties hereto, have the property reappraised. [Transfer & Storage] may also at any time have the property reappraised. Should the appraisal(s) indicate a value in excess of the settlement valuation(s) listed herein, such excess will be paid in the form of notes payable to Patricia Lathrom Enright and Donald Lathrom for their respective interests, such notes to incorporate the same terms and conditions as the "Smith Notes" defined in the AGREEMENT of even date referred to above, at the then prevailing interest rate payable over the remaining term of the Smith Notes, as of the first day of the first month following the expiration of the notice period.

3. If the appraisers representing the parties hereto cannot agree on an appraisal value then they shall appoint a third appraiser whose decision shall be binding upon the parties.

4. If the properties are sold to any party who is not at arms length with the seller the appraisal mechanism described above may be invoked by Patricia Lathrom Enright and Donald Lathrom for the purpose of computing the amount of the consideration to which they shall become entitled.

5. If either or both of the properties are sold at an amount in excess of the settlement valuation referred to herein, Patricia Lathrom Enright and Donald Lathrom shall be paid their pro rata share of such excess in cash, as the cash received by the sellers in such sale bears to the total sale price. Notes as provided in Paragraph 2 herein for the portion not payable to Patricia Lathrom Enright and Donald Lathrom shall be issued only for the difference not payable in cash.

The Fullilove children's complaint was dismissed with prejudice by the Probate Court pursuant to a praecipe filed by Collins. The 1968 will was admitted to probate. Schroeder and Arthur Smith were appointed coexecutors of the Smith estate. The executors of the Smith estate and of the Fullilove estate petitioned for and received authority from the Probate Court to sell stock pursuant to the 1971 settlement agreement.

Thereafter, on December 23, 1971, the Smith corporations redeemed all of the stock held by the Fullilove estate and the

Fullilove children, and a portion of the stock held by the Smith estate, for cash and Transfer & Storage's secured, interest-bearing notes, in accordance with the 1971 settlement agreement. Such redemptions are hereinafter referred to as the 1971 redemptions.

The notes Transfer & Storage issued to the Fullilove estate and the Smith estate pursuant to the 1971 settlement agreement were guaranteed by Arthur Smith. The Fullilove children's representatives had wanted Martha Smith's guarantee also, but Schroeder refused. He did not consult Martha Smith as to whether she would be willing to give the requested guarantee since he regarded her as having nothing to do with the controversy.

The Smith estate ultimately distributed its remaining shares of stock in the Smith corporations to Arthur Smith. The notes Transfer & Storage issued to the Fullilove estate and the Smith estate were ultimately distributed to the Fullilove children.

The following schedule shows the retained earnings for the Smith corporations as of December 31, 1971, as shown on their respective books of accounts, and the amount of cash distributed by them in 1971. The figures shown for retained earnings do not reflect the cash distribution.

| Corporation | Retained earnings | Cash distributed |
|---|---|---|
| Transfer & Storage | $323,228.12 | $70,784.14 |
| Bladensburg | 70,023.84 | 74,689.82 |
| Champlain | 356,585.81 | 176,107.58 |
| Insurance | 56,538.84 | 18,637.65 |
| | | 340,219.19 |

During 1972 Transfer & Storage paid $13,647 of interest and $16,200 of principal on the Fullilove estate's notes, and $9,098 of interest and $10,800 of principal on the Smith estate's notes.

In 1973 Transfer & Storage suffered serious losses on a large Government contract as a result of inflation and material shortages. Its financial position became untenable. In January 1974, Arthur Smith sold his stock in the Smith corporations to a wholly owned subsidiary of Mayflower Corp. for the nominal price of $1 per corporation plus the right to receive half of the corporations' net earnings, if any, from January 1, 1974, through December 31, 1978. The Fullilove children released Arthur Smith from his secondary liability on Transfer & Storage's notes in exchange for notes guaranteed by Mayflower Corp.

*Facts Relating to the Section 6013(e) Issue*

Petitioner Martha Smith did not own any stock in the Smith corporations. She did work in the Smith business for a short time toward the end of World War II. Beginning in the early 1960's she aided her husband's business by cosigning financial documents and pledging her separate stock holdings to secure loans to the corporations. She attended some of the corporate meetings of directors and shareholders. Occasionally she discussed business matters with Arthur Smith.

Martha Smith never saw a copy of the 1960 stock purchase agreement until the trial of this case. She was aware of its existence, however, through conversations with Arthur Smith. She was aware that under the 1960 stock purchase agreement Arthur Smith was to buy his father's stock, so that he would have control. Martha Smith also had a general familiarity with the other events leading to the 1971 redemptions. After the death of the senior Mr. Smith, Mrs. Smith became aware of the fact that a controversy had developed concerning his will as a result of a claim by the Fullilove children that the senior Mr. Smith lacked testamentary capacity. Her husband kept her generally informed of the progress of the negotiations which followed. During 1971, Martha and Arthur Smith discussed in general terms the settlement. Martha knew that the Fullilove children were to receive approximately $840,000. She believed that this was too much money and that her niece and nephew were taking advantage of her husband and the Smith corporations.

## OPINION

The issues for our decision arose from stock redemptions by the various corporations which constituted the Smith family moving business. Under the 1971 settlement agreement these corporations redeemed all of the stock in which Arthur Smith's niece and nephew, the Fullilove children, had a beneficial interest. Part of the redeemed stock was held by the estate of Arthur Smith's father at the time of the redemption. The remainder of the stock which was redeemed was held by the Estate of Elizabeth Fullilove, Arthur Smith's sister, and by the Fullilove children.

All of the redeemed stock had been subject to the 1960 stock

purchase agreement executed by Arthur Smith and his father, the senior Mr. Smith. Under that agreement Arthur Smith was unconditionally obligated to purchase the stock held by his father's estate. The 1960 stock purchase agreement also gave the Fullilove estate and children the right to sell their stock to Arthur Smith within 10 years of the death of the senior Mr. Smith if they so desired. The 1960 stock purchase agreement specified that the price for such purchases was to be calculated by increasing the book value of the corporations by the unrealized appreciation in corporate real estate as determined by the accountant then servicing the corporations.

Respondent contends that the redemptions by the corporations were in satisfaction of Arthur Smith's obligations under the 1960 stock purchase agreement and therefore constitute constructive dividends taxable to him. Petitioners, on the other hand, contend that the redemptions resulted from a new agreement undertaken primarily for the corporate business reason of resolving a deadlock in management and therefore no constructive dividend should result. Alternatively, petitioners argue that, although Arthur Smith was primarily and unconditionally obligated to purchase the stock from the Smith estate, no such unconditional obligation existed to purchase the stock held by the Fullilove estate and children and therefore no constructive dividends resulted from those redemptions. Finally, petitioner Martha Smith argues that the innocent spouse provisions of section 6013(e) relieve her from any income tax liability arising from the redemptions. After careful analysis of the pertinent case law and the facts here, we conclude that Arthur Smith received a constructive dividend only from the redemption of that portion of the stock held by the estate of the senior Mr. Smith. We also conclude that the relief provisions of section 6013(e) are inapplicable here.

The law is well settled that if a corporation satisfies a personal obligation of a shareholder a constructive dividend may result to the extent of corporate earnings and profits. *Sachs v. Commissioner*, 32 T.C. 815, 820 (1959), affd. 277 F.2d 879, 882 (8th Cir. 1960), cert. denied 364 U.S. 883 (1960). Courts have consistently found a constructive dividend if a corporation redeems stock which a remaining shareholder was unconditionally personally obligated to purchase. *Sullivan v. United States*, 363 F.2d 724 (8th Cir. 1966), cert. denied 387 U.S. 905 (1967); *Wall v. United*

*States*, 164 F.2d 462 (4th Cir. 1947); *Stephens v. Commissioner*, 60 T.C. 1004 (1973), affd. 506 F.2d 1400 (6th Cir. 1974).

The first issue concerns the application of the foregoing principles of law to the corporate redemptions of the stock held by the Smith estate. Under the 1960 stock purchase agreement Arthur Smith was unconditionally obligated to purchase the stock from his father's estate. The redemptions satisfied this personal unconditional obligation. We find the conclusion inescapable that a constructive dividend to Arthur Smith resulted.

Petitioner's legal arguments otherwise are essentially three-fold. First, petitioner argues, the 1971 redemptions did not constitute a performance by the Smith corporations of Arthur Smith's obligations under the 1960 stock purchase agreement but rather the performance of a new and different agreement which therefore distinguishes the facts here from those cases in which a constructive dividend has been found. It is true that the price and terms of the 1971 settlement agreement varied from those of the 1960 stock purchase agreement. We do not think, however, that this factual distinction requires a holding that Arthur Smith received no constructive dividend. The redemptions nonetheless relieved him of his unconditional obligation to purchase the stock held by the Smith estate. The variation in contract terms in no way negates the benefit received by Arthur Smith as a result of the corporate redemptions which satisfied his obligations. He must therefore be charged with a constructive dividend.

Second, petitioner argues that no constructive dividend should be found since the redemptions were carried out primarily for the valid corporate business reason of resolving the deadlock in management incident to the will litigation.[2] We disagree.

---

[2]Petitioner places primary reliance on *Decker v. Commissioner*, 32 T.C. 326 (1959), affd. per curiam 286 F.2d 427 (6th Cir. 1960). That case is distinguishable, however, since in *Decker* this Court relied in large part on its finding that the redemption was for valid corporate business reasons. We have made no such finding here.

*Decker* may further be distinguished since the corporate redemptions there were not in direct satisfaction of the taxpayers' obligation. The taxpayers in that case fulfilled their own obligations to purchase the stock. Subsequently, pursuant to their prearranged plan, the corporation redeemed the same stock from them. Consequently, the focus in *Decker* was on whether the redemption was not essentially equivalent to a dividend under sec. 302(b)(1).

Moreover, to the extent this Court relied on a valid corporate business purpose to find no constructive dividend in *Decker*, our holding there is invalid in light of the Supreme Court's subsequent decision in *United States v. Davis*, 397 U.S. 301 (1970). In *Davis* the Supreme Court examined a pro rata corporate distribution in light of the legislative history of treatment of corporate

Although dissension existed in management, this may be attributed solely to Arthur Smith's inability to perform his obligations under the 1960 stock purchase agreement. The primary reason for redemption of the Smith estate stock was Arthur Smith's financial inability to fulfill his personal obligation to purchase the stock. Fulfilling this personal shareholder obligation was not incidental to a valid corporate business purpose; it was the primary reason for the redemption. Cf. *Schalk Chemical Co. v. Commissioner*, 32 T.C. 879, 887–889 (1959), affd. 304 F.2d 48 (9th Cir. 1962).

Finally, petitioners rely on the economic benefit analysis in *Decker v. Commissioner*, 32 T.C. 326, 333 (1959), as support for the proposition that Arthur Smith received no economic benefit from the redemption here since at "the conclusion of the

---

distributions to shareholders and noted that:

"Congress clearly mandated that pro rata distributions be treated under the general rules laid down in secs. 301 and 316 rather than under sec. 302 and nothing suggests that there should be a different result if there were a "business purpose" for the redemption. * * * We conclude that the Court of Appeals was therefore wrong in looking for a business purpose and considering it in deciding whether the redemption was equivalent to a dividend. Rather, we agree with the Court of Appeals for the Second Circuit that "the business purpose of a transaction is irrelevant in determining dividend equivalence" under sec. 302(b)(1). *Hasbrook v. United States*, 343 F.2d 811, 814 (1965). [397 U.S. at 312]."

Thus petitioner's attempts to argue that the redemptions here were motivated by a valid corporate business purpose and therefore within the scope of our holding in *Decker* are to no avail. See, e.g., *Benjamin v. Commissioner*, 66 T.C. 1084, 1106 (1976); *Grabowski Trust v. Commissioner*, 58 T.C. 650, 659 (1972); *Coates Trust v. Commissioner*, 55 T.C. 501, 514 (1970), affd. 480 F.2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045 (1973).

The more difficult question is whether a valid business purpose may still be used as a factor which precludes a finding of a constructive dividend in those cases where, as here, the total redemption of one shareholder's stock satisfies a preexisting unconditional obligation of a remaining shareholder to purchase that stock. Outside of the sec. 302(b)(1) area, examination for a valid corporate business purpose may still be used in many cases in which corporate expenditures arguably were made for a shareholder's personal benefit. See, e.g., *Rapid Electric Co. v. Commissioner*, 61 T.C. 232, 239 (1973); *Ross Glove Co. v. Commissioner*, 60 T.C 569, 595 (1973); *Dean v. Commissioner*, 57 T.C. 32, 40 (1971).

Petitioners have pointed to no authority, however, for considering a valid corporate business purpose in determining whether a constructive dividend results if a corporate redemption satisfies the remaining shareholder's unconditional obligation to purchase the stock. Our finding that the redemptions here were not primarily motivated by a valid corporate business purpose precludes the necessity of passing on whether such a motivation could prevent a finding of a constructive dividend. We have serious reservations, however, whether petitioners could have prevailed on the facts here even if we did accept their contention that the motivation for the redemption was primarily for a valid corporate business reason. The facts surrounding the redemption which satisfied Arthur Smith's liability here are more analogous to the cases under the dividend equivalency tests of sec. 302(b)(1) such as *Decker*, for which business purpose has been held irrelevant, than to the cases which still properly consider corporate business purposes in examining corporate expenditures from which shareholders receive a personal benefit. We will forego addressing this question, however, until it is embodied in a case which requires its resolution.

redemption transaction, he had increased his percentage interest in the corporations, but the value of the corporations had been proportionately reduced by the cash paid and the obligations incurred in connection with the redemptions." Such an analysis which focuses only on the shareholder's net worth improperly ignores the status of the corporation as a separate taxable entity, distributions from which are generally taxable as dividends to its shareholders. As noted by the Supreme Court in *Davis v. Commissioner,* if "a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders." 397 U.S. 301, 313 (1970). Such a transfer results in a dividend taxable, however, to the extent of earnings and profits of the corporation pursuant to sections 301 and 316 notwithstanding the fact that the shareholders may experience no increment in their net worth. The effect of the corporate redemptions of the Smith estate stock here was essentially equivalent to the corporations' paying Arthur Smith a dividend directly and his using the dividend received to satisfy his personal unconditional obligation to purchase the stock. Cf. *Maher v. Commissioner,* 55 T.C. 441, 453 (1970), Supplemental Opinion 56 T.C. 763 (1971), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972). Although the value of Arthur Smith's interest in the corporation may have remained unchanged, he still received the benefit of being relieved of his personal obligation to purchase the Smith estate stock and must be charged with a constructive dividend. *Sullivan v. United States,* 363 F.2d 724, 729 (8th Cir. 1966).

The second issue is whether Arthur Smith received constructive dividends as a result of corporate redemptions of the stock held by the Fullilove estate and children. The legal principles here are the same as above. If a redemption satisfies an unconditional personal obligation of a remaining shareholder to purchase the stock, a constructive dividend results. We have found as a fact, however, that contrary to respondent's contentions Arthur Smith was never unconditionally obligated to purchase the Fullilove stock. It is true that the Fullilove estate and children had the right to sell the stock to Arthur Smith under the 1960 stock purchase agreement. However, the 1960 stock purchase agreement did not require such a sale. The Fullilove estate and children were free to sell the stock to a third

party if they so desired. The existence of the option increased the Fullilove children's bargaining power and was instrumental in enabling them to obtain the corporate redemption at favorable terms. The fact remains, however, that at no time was Arthur Smith formally requested to personally purchase the stock under the terms of the 1960 stock purchase agreement and therefore never became personally and unconditionally liable. Under these circumstances the redemption of the stock held by the Fullilove estate and children did not result in a constructive dividend to Arthur Smith. *Kobacker v. Commissioner*, 37 T.C. 882, 896 (1962); *S. K. Ames, Inc. v. Commissioner*, 46 B.T.A. 1020, 1023–1024 (1942).

The final issue is whether Martha Smith qualifies as an innocent spouse under section 6013(e)(1) for relief from liability for the tax deficiency arising from the redemption of the Smith estate stock. The statute provides three requirements, all of which must be met if a spouse who signed a joint return is to be relieved from joint and several liability:

> (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—
> (1) IN GENERAL. Under regulations prescribed by the Secretary or his delegate, if—
>> (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,
>> (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and
>> (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,
>
> then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

Petitioner fails to meet the last two of the above requirements and, consequently, is disqualified by each.

Martha Smith had a sufficient familiarity with the facts surrounding the 1971 redemptions to be charged with knowledge of the transactions which caused the omissions. The evidence of record establishes that her husband kept her generally informed of the negotiations and the 1971 settlement. Martha Smith

therefore fails to meet the requirement of section 6013(e)(1)(B) that she did not know of, and had no reason to know of, the omission from income. It is immaterial that both she and her husband were unaware of the tax liability created by the corporate satisfaction of Arthur Smith's personal obligation to purchase the stock held by the Smith estate. *Quinn v. Commissioner*, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974). As we noted in *McCoy v. Commissioner*, 57 T.C. 732, 734 (1972):

We can understand their frustration, but we do not think section 6013(e) was designed to abate joint and several liability where the lack of knowledge of the omitted income is predicated on mere ignorance of the legal tax consequences of transactions the facts of which are either in the possession of the spouse seeking relief or reasonably within his reach.

Nor is it inequitable to hold Martha Smith liable for the deficiency taking into account the fact that she received a significant benefit from the item omitted from gross income. See sec. 6013(e)(1)(C). If the corporations had not redeemed the Smith estate stock, Arthur Smith would have remained personally obligated to purchase the stock. The financial burden this would have placed on the household shared by Arthur and Martha would have been tremendous. Martha may well have been called upon to aid Arthur with her separate assets. The redemptions prevented these potential hardships and thereby benefited Martha Smith directly or indirectly.

In summary, we hold that petitioners are jointly and severally liable for the tax deficiency arising from the constructive dividends to Arthur Smith upon the corporate redemptions of stock held by the Smith estate. We hold further that the redemption of the stock held by the Fullilove estate and children did not result in a constructive dividend to Arthur Smith.

To reflect concessions made by the parties and our conclusions on the disputed issues,

*Decisions will be entered under Rule 155.*