JAMES G. McKEOWN and JACQUELINE M. McKEOWN, ET AL., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McKeown v. Commissioner
Docket Nos. 2389-77, 12370-77, 12429-77 [1]
United States Tax Court
T.C. Memo 1980-18; 1980 Tax Ct. Memo LEXIS 563; 39 T.C.M. (CCH) 917; T.C.M. (RIA) 80018; January 23, 1980, Filed Leslie M. Hartman, for the petitioners. Gerald J. Beaudoin, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Petitioner
Docket No.
Year Ended
Deficiency
James G. and Jacqueline
2389-77
12/31/72
$ 6,375
M. McKeown
James G. and Jacqueline
12429-77
12/31/73
7,413
M. McKeown
12/31/74
3,416
12/31/75
3,232
Jerry McKeown Oldsmobile-
12370-77
12/31/71
981
Cadillac Corporation
The sole issue for decision is whether James G. and Jacqueline M. McKeown realized dividend income when Jerry McKeown Oldsmobile-Cadillac Corporation made payments on a loan obtained to purchase stock in Jerry McKeown Oldsmobile-Cadillac Corporation. FINDINGS OF FACT Some of the *564 facts have been stipulated and are found accordingly. At the time of filing their petitions, petitioners James G. McKeown and Jacqueline M. McKeown ("the McKeowns") were residents of California, and Jerry McKeown Oldsmobile-Cadillac Corporation ("Corporation") had its principal place of business in California. Corporation was incorporated on August 19, 1963, as an automobile dealership known as the Vic Gabrielson Oldsmobile-Cadillac Corporation. Originally, Vic Gabrielson ("Gabrielson") owned all of the 1,220 outstanding shares of Corporation. On April 9, 1969, petitioner James G. McKeown ("McKeown") entered into an agreement with Gabrielson to purchase 25 percent (305 shares) of Gabrielson's stock in Corporation for $30,500. McKeown paid $10,000 cash down and signed a promissory note for the remaining $20,500. The purchase contract also granted McKeown an option to purchase Gabrielson's remaining 915 shares. Shortly after this purchase, Corporation's name was changed to Jerry McKeown Oldsmobile-Cadillac Corporation. After executing the stock purchase agreement with McKeown, Gabrielson obtained a loan from the United California Bank ("UCB") to purchase an Oldsmobile *565 dealership in Burlingame, California.This loan was secured by a pledge of Gabrielson's remaining 915 shares in Corporation and by McKeown's $20,500 promissory note. In 1971 Gabrielson experienced difficulty in meeting his financial obligations to UCB. As a result, on or about December 3, 1971, Gabrielson contacted McKeown and asked him whether he wanted to purchase the remaining 915 shares of Corporation. Although McKeown was interested, he did not have sufficient funds to purchase the stock. Gabrielson agreed to make loan arrangements for McKeown with UCB. Shortly after this conversation with Gabrielson, McKeown met with Dale Stanhope, a Certified Public Accountant that McKeown was interested in hiring in the event he gained control of the Corporation. At this meeting, McKeown and Stanhope briefly discussed the purchase of the Gabrielson stock. Stanhipe indicated that a redemption plan could be effected by setting up an account on Corporation's books for treasury stock and by Corporation making the payments on any loan obtained from UCB. On December 3, 1971, the board of directors of Corporation met to discuss Gabrielson's offer to sell his stock. The meeting was attended *566 by James G. McKeown, President, Jacqueline M. McKeown, Vice-President, Vic Gabrielson, Chairman of the Board, and Helen Palmer, Secretary-Treasurer.The minutes of this meeting reflect that "Mr. Gabrielson said he would arrange a meeting with United California Bank Officers and the President and Vice President agreed to attend." On December 7, 1971, the McKeowns met with Gabrielson and three UCB officials at UCB's office in Burlingame. The McKeowns were not accompanied by either an accountant or a lawyer. During the meeting, the McKeowns completed a loan application and a personal financial statement. They listed their net worth on the financial statement as $46,253.25. The loan application made no reference to the McKeowns acting on behalf of Corporation. The McKeowns applied for a $120,600 loan. The loan amount equals the $100,100 purchase price for Gabrielson's 915 shares of stock plus the full $20,500 promissory note McKeown still owed Gabrielson. Prior to the December 7 meeting at UCB, the bank personnel prepared the documents associated with the $120,600 loan. The form of the loan was structured by one of UCB's senior officers in the automotive division. Gabrielson *567 did not know or care whether the McKeowns or Corporation purchased his 915 shares of stock. On December 7 the McKeowns, in their individual capacities, executed the previously prepared loan agreement and promissory note making them primarily liable on the loan with Corporation as guarantor. The McKeowns also executed a security agreement. McKeown, as president of Corporation, executed a resolution authorizing Corporation's officers to execute a corporate guarantee. McKeown, again as president, also executed a guarantee naming Corporation as guarantor of the loan. At this time, Corporation had a net worth of $132,493 and a net profit of $27,198.48 for the first eleven months of 1971. Originally, Corporation had two outstanding stock certificates representing 305 shares and 915 shares.Gabrielson was listed as record holder of the full 1,220 shares.Gabrielson transferred 305 shares (certificate No. 1) to the McKeowns pursuant to the April 9, 1969 agreement. At the december 7, 1971 meeting, Gabrielson transferred the remaining 915 shares (certificate No. 2) to the McKeowns. The McKeowns then pledged the full 1,220 shares held by them as collateral for the loan. The ledger sheets *568 of Corporation reflect that on December 7, 1971, 915 shares of its stock were transferred to the McKeowns. There is no indication on these sheets that the transfer was made to the McKeowns as officers or representatives of Corporation. The loan from UCB was in the form of a $120,600 line of credit with UCB. On December 7, the McKeowns opened a line of credit account at UCB in their individual names. McKeown then signed a $120,600 check drawn on this account made payable to Gabrielson. The check was postdated January 3, 1972, to give Gabrielson time to resign from the board of directors. The loan proceeds were transferred to the McKeowns' line of credit account on January 2, 1972. On or after January 3, 1972, Gabrielson endorsed the $120,600 check made payable to him. The entire meeting at UCB on December 7, 1971, lasted one hour and fifteen minutes. Although McKeown went to this meeting with the idea of representing Corporation, neither of the McKeowns held themselves out as representing Corporation except when executing the corporate resolution to guarantee the loan and the guarantee itself. The McKeowns never objected to the form of the loan making them primarily liable. *569 McKeown did not know that there were possible adverse tax consequences to becoming personally obligated. He assumed that setting up an account for treasury stock on Corporation's books at some later date would effect a redemption. UCB considered the McKeowns the primary obligors on the loan. However, UCB expected the primary source of repayment to be from the monthly income of Corporation. The UCB loan approval report dated January 26, 1972, states: Financing appears generous in relation to borrower's N/W [net worth] of $46,000 and cash throwoff of his now wholly owned dealership narrowly covers term debt servicing requirements. On January 3, 1972, Gabrielson resigned from the board of directors of Corporation. The board of directors met on January 4, 1972, and accepted Gabrielson's resignation. The minutes of that meeting state: The financial transaction of the stock transfer was discussed and the President (McKeown) was directed to employ the services of a new accounting firm, namely Bean & Stanhope to determine how to incorporate the loan and enter it on the financial statement. On January 14, 1972, McKeown wrote the following letter to L. S. Pletcher, Oldsmobile *570 Division of General Motors Corporation, Walnut Creek, California: Gentlemen: Effective January 3, 1972, a Stock Transfer has been effected between V. W. Gabrielson and myself. Financial arrangements have been consumated [sic] and 100% of the Stock of this Corporation is now in my name. Mr. Gabrielson has also tendered his resignation effective this date. Sincerely, J. G. McKeown Prior to January 31,1972, McKeown met with the new accountant, Dale Stanhope. Pursuant to the accountant's advice, Corporation's bookkeeper made a journal entry in the corporate books on January 31, 1972, to record the purchase by the corporation of 915 shares of outstanding corporate stock at a total price of $100,100, effective January 3, 1972. The journal entry reflects a debit to "treasury stock" for $100,100 and a credit to "long term debt" for $100,100. The board of directors of Corporation met again on January 31, 1972. The minutes of that meeting reflect the following: New business discussed was the outcome of the President's meeting with our new accounting firm, Bean & Stanhope. It was suggested that Treasury Stock in the amount of $100,100.00 be entered on the Statement *571 and backed by a promissory note to James G. and Jacqueline McKeown and the monthly payments of $2,416 be paid by the Corporation until the amount of the 75% of the stock be redeemed by the Corporation. * * * Beginning February, 1972, Corporation paid directly to UCB the monthly $407 interest and $2,010 principal due on the loan. Corporation's new accountant set up the corporate books to amortize the interest over the life of the loan. McKeown and the accountant planned for Corporation to pay $100,100 of the loan (representing the purchase price of the 915 shares of stock bought from Gabrielson) and then for the McKeowns to pay the $20,500 balance (representing the balance due on McKeown's original promissory note to Gabrielson). Corporation paid the following amounts to UCB during the years in issue: Year
Principal
Interest
Total
1972
$ 22,110
$ 4,477
$ 26,587
1973
22,110
4,477
26,587
1974
11,213
4,786
15,999
1975
11,213
5,787
17,000
Corporation claimed an interest expense deduction of $4,786 for 1974. In his notice of deficiency issued to Corporation, respondent disallowed this deduction which decreased a net operating loss carryback *572 to 1971. Respondent determined that the interest expense was the expense of the McKeowns and therefore not deductible by Corporation. Respondent further determined that the payments of principal and interest on the loan were constructive dividends to the McKeowns in the years of repayment. Accordingly, in his notices of deficiency issued to the McKeowns, respondent determined that the McKeowns had unreported dividend income of $26,587 for 1972, $26,587 for 1973, $15,999 for 1974 and $17,000 for 1975. Respondent allowed an interest expense deduction to the extent the payments made by the Corporation on the McKeowns behalf were applied to interest. The interest expense deductions allowed were $4,477 for 1972, $4,477 for 1973, $4,786 for 1974 and $5,787 for 1975. OPINION The issue for decisionis whether petitioners James G. and Jacqueline M. McKeown ("the McKeowns") realized dividend income (taxable under section 316, [2]) when Jerry McKeown Oldsmobile-Cadillac Corporation ("Corporation") made payments on a loan obtained by them from the United California Bank ("UCB") to purchase 915 shares of Corporation. More specifically, the issue is whether the McKeowns acted personally, *573 rather than as conduits or agents of Corporation, in acquiring Gabrielson's stock and in becoming primarily obligated on the loan so that subsequent payments to UCB by Corporation resulted in constructive dividend income to the McKeowns.
If a corporation satisfies a personal obligation of a shareholder, a constructive dividend may result to the extent of corporate earnings and profits. Wall v. United States,164 F.2d 462, 464 (4th Cir. 1947); Smith v. Commissioner,70 T.C. 651, 668 (1978). Petitioners do not dispute this well-settled principle, nor do they contend that earnings and profits did not suffice to cover the payments in question. They contend that the McKeowns acted as agents or conduits for Corporation in becoming personally liable on the loan from UCB. Petitioners contend that in substance Corporation redeemed the 915 shares of stock and that the payments made by Corporation to UCB were in discharge of Corporation's own indebtedness. On the other hand, respondent contends that the McKeowns personally borrowed the money *574 from UCB and personally purchased the stock. As a result, respondent argues, the payments made by Corporation on this indebtedness were in discharge of the McKeowns' obligation and constituted constructive dividends. We agree with respondent. In support of their contentions, petitioners first argue that UCB dictated the form of the loan transaction making the McKeowns primarily liable and naming Corporation as guarantor. Petitioners point out that taking legal title to stock and becoming personally obligated on a loan is not fatal where it is shown that the corporation was the intended purchaser. Ciaio v. Commissioner,47 T.C. 447 (1967); Bennett v. Commissioner,58 T.C. 381 (1972). Here, however, petitioners fail to show that the form of the transaction was not what was intended. Specifically, the McKeowns voiced no objection at the December 7, 1971 meeting to the form of the transaction that UCB presented to them; nor did the McKeowns hold themselves out as representing Corporation except when executing the corporate guarantee. The loan proceeds were deposited in McKeowns' personal account and then disbursed to Gabrielson. McKeown's letter *575 to the Oldsmobile Division of General Motors Corporation, dated January 14, 1972, states that there had been a stock transfer from Gabrielson to him and that 100 percent of the stock of Corporation was now in his name. Furthermore, this is not a situation in which the transaction was statured with the McKeowns as purchasers at the insistence of the seller. Gabrielson, the seller, did not care whether the transaction took the form of a redemption by Corporation or a personal purchase by petitioners. See Bennett v. Commissioner, supra.
Gabrielson assigned the stock certificate for the 915 shares in issue to the McKeowns personally. The McKeowns did not endorse the certificate in blank so that it could later be assigned to Corporation. See Erickson v. United States,189 F. Supp. 521 (S.D. Ill. 1960). The McKeowns continued to retain legal ownership of the stock even after Corporation made payments on the loan. None of the stock was ever actually held as treasury stock by Corporation. Although UCB structured the form of the loan no evidence was introduced from which we could infer that UCB would not have been amenable to having Corporation *576 primarily liable on the loan. See Fox v. Harrison,145 F. 2d 521 (7th Cir. 1944); Ciaio v. Commissioner,supra. In fact, UCB expected Corporation's income to be the primary source for the McKeowns' repayment of the loan. Petitioners did not present any evidence demonstrating Corporation's inability to directly finance the purchase. Petitioners' second argument, that the stock purchase was part of a prearranged plan of redemption of Gabrielson's stock by Corporation, is not supported by the record. The minutes of Corporation's board of directors' meeting held on December 3, 1971, do not refer to a plan of redemption. Furthermore, the directors did not authorize the McKeowns to act as agents for Corporation to purchase Gabrielson's stock at the December 3 meeting.Corporation took no action toward effecting a redemption until mid-January 1972 when McKeown, as president, consulted with Corporation's newly-hired accountants as to how to handle the purchase of Gabrielson's stock. By this time, the stock purchase was complete and the McKeowns were primarily liable on the loan from UCB. On January 31, 1972, after McKeown met with the accountants, *577 Corporation's secretary-treasurer made a journal entry in the corporate books recording the purchase for $100,100 of 915 shares of outstanding corporate stock, effective January 3, 1972. Although a ledger account was created for "treasury stock", the McKeowns' stock was never assigned to Corporation. The ledger sheets of Corporation reflect that on December 7, 1971, 915 shares of its stock were transferred to the McKeowns. There is no indication that the transfer was made to the McKeowns as officers or agents of Corporation. See Wall v. Commissioner,supra; Adams v. Commissioner,69 T.C. 1040 (1978), affd. 594 F. 2d 657 (8th Cir. 1979); Deutsch v. Commissioner,38 T.C. 118 (1962). Third, petitioners advance the argument that the McKeowns did not receive any economic benefit from the transaction except a proportionate increase in the reduced assets of Corporation, i.e., that, in effect, the McKeowns began with 25 percent of $100 and ended up with 100 percent of $25. This argument ignores the fact that although the McKeowns' interest in Corporation may have remained unchanged, they still received the benefit of being *578 relieved of their personal obligation to repay UCB. See Smith v. Commissioner,supra at 671; Sullivan v. United States,363 F.2d 724, 728-729 (8th Cir. 1966), cert. denied 387 U.S. 905 (1967). In light of the above, we conclude that the McKeowns personally incurred the $120,600 liability on the loan and were not acting as agents or conduits of Corporation when purchasing Gabrielson's stock. Petitioners made no attempt to structure the purchase of Gabrielson's stock as a redemption until after the transaction was completed. As the court stated in Woodruff v. Commissioner,131 F. 2d 429, 430 (5th Cir. 1942): [if] a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed. Accordingly, we hold that the payments made by Corporation to UCB on the McKeowns' loan were in discharge of the McKeowns' personal obligation which resulted in constructive dividends to them during 1972, 1973, 1974 and 1975 to the extent of Corporation's *579 earnings and profits in those years. Decisions will be entered for the respondent.
Footnotes
1. The following cases were consolidated for purposes of trial, briefing and opinion: Jerry McKeown Oldsmobile-Cadillac Corporation, Docket No. 12370-77 and James G. McKeown and Jacqueline M. McKeown, Docket No. 12429-77.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩