CAROLYN J. MUELLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mueller v. Commissioner
Docket No. 22944-87
United States Tax Court
T.C. Memo 1993-412; 1993 Tax Ct. Memo LEXIS 417; 66 T.C.M. (CCH) 621; September 7, 1993, Filed *417 Decision will be entered under Rule 155. For petitioner: Stephen L. Koenig and Thomas P. Rosenfeld (specially recognized). For respondent: Darrell C. Weaver. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiency in, and additions to, the Federal income tax of petitioner and her former husband, Mr. Charles F. Mueller, Jr., for 1983: Additions to Tax Sec.
Sec. Sec. Deficiency
6653(a)(1)
6653(a)(2) 6661(a) $ 106,109
$ 5,411
50% of the
$ 26,527
interest due
on $ 106,109
After concessions, the sole issue for decision is whether petitioner is entitled to relief as a so-called innocent spouse under section 6013(e). All section references are to the Internal Revenue Code. FINDINGS OF FACT The parties have stipulated some of the facts in this case. The Stipulation of Facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Decatur, Illinois, at the time the instant petition was filed on her behalf. Petitioner was born in Bloomington, Illinois, on August 5, 1945. She attended a combination of public, parochial, *418 and special education schools in the Bloomington area. She graduated from high school in 1965, shortly before her 20th birthday. From 1965 through 1980, petitioner worked as a secretary and a waitress in Chicago and Bloomington, Illinois. During that period, she obtained a cosmetology license. She also completed degrees in secretarial science, and in marketing and sales at Mid-State College in Peoria, Illinois. Between 1965 and 1974, petitioner was married and divorced twice. Her former husbands handled all financial and tax matters during the marriages. Neither marriage produced a child. At the time each marriage ended in divorce, petitioner asked for, and received, no alimony or other support, and she received very little property. From 1974 through 1980, petitioner worked as a secretary and maintained her own checking account. In 1980, petitioner met Mr. Charles F. Mueller, Jr. Approximately 4 months later, she quit her job and began living with Mr. Mueller. They were married on June 19, 1982, in Decatur, Illinois. Prior to marrying Mr. Mueller, petitioner obtained discharge of most of her personal obligations under the U.S. bankruptcy laws. Mr. Mueller had insisted *419 that she take that step to shield him from responsibility for her debts and other liabilities. Mr. Mueller's lawyer, Mr. Frank Byer, handled petitioner's bankruptcy. Although petitioner had maintained a checking account before she met Mr. Mueller, after she began living with him, she did not maintain a bank account. Mr. Mueller handled all of the couple's finances, and he gave petitioner a monthly allowance of $ 100. Petitioner had no substantive knowledge of Mr. Mueller's business affairs. At the time of her marriage to Mr. Mueller, his father, Mr. Charles Mueller, Sr., was approximately 91 years of age and was in declining health. At that time, the elder Mr. Mueller was living in an apartment in St. Louis, Missouri, with his wife, Anne. Mr. Mueller managed his father's financial affairs and had done so since approximately 1979. In late 1982 or early 1983, Mr. Mueller's father became ill and required hospitalization. At approximately the same time, medical problems forced Mr. Mueller's mother to move into a nursing home. Even after the elder Mr. Mueller recovered from his illness, he needed assistance in performing everyday activities. Rather than permit his father to *420 live in a nursing home, Mr. Mueller invited his father to live with him and petitioner. The elder Mr. Mueller began living with petitioner and her husband in February 1983. In June 1983, Mrs. Anne Mueller also came to live with them. Because of the advanced age and poor physical condition of the elderly couple, caring for them became a full-time job for petitioner. The elder Mr. Mueller agreed to pay $ 3,000 per month for the care that the elder couple was receiving from Mr. Mueller. The elder Mr. Mueller executed a maintenance agreement, prepared by Mr. Mueller's attorney, to memorialize the oral agreement. Petitioner was aware of those arrangements. During the period in which his father lived in his home, Mr. Mueller misappropriated over $ 250,000 of his father's money. Shortly after the elder Mr. Mueller arrived at the couple's home, petitioner's husband and the elder Mr. Mueller opened three joint checking accounts. Petitioner witnessed her father-in-law give checks totaling at least $ 190,000 to her husband. In July 1983, Mr. Mueller, Sr., gave his son a check for $ 40,000. In August 1983, the elder Mr. Mueller gave his son a check for $ 30,000, and in October 1983, *421 he gave four or five checks of $ 30,000 each to his son. In addition, petitioner saw checks lying on her husband's desk that had been drawn by her father-in-law and made payable to her husband. Petitioner's husband told her that the checks represented "his inheritance", and, at the time the checks were written, she assumed that they were gifts. The elder Mr. Mueller and his wife lived with petitioner and her husband until October 1983. At some point thereafter, the elder Mr. Mueller and his daughter accused petitioner's husband of misappropriating money from the elder Mr. Mueller, and they demanded return of the money. On January 19, 1984, the elder Mr. Mueller filed suit against his son in Macon County, Illinois. The suit claimed that the son had breached a fiduciary duty owed to the father. It demanded an accounting of the moneys received by the son from his father and the return of any moneys that had been misappropriated. In late December 1983, Mr. Mueller and petitioner drove to Florida. In the previous 3 years of their relationship, the couple's longest vacation had lasted 2 weeks. After spending 2 weeks in Winter Haven, Florida, with petitioner's parents, petitioner *422 and her husband rented an apartment in De Land, Florida. Mr. Mueller continued to manage his automotive repossession business from the rented apartment. The couple also rented a post office box in petitioner's maiden name, Carolyn Hirsch. A friend or long-standing employee sent business mail to Mr. Mueller at the post office box rented in petitioner's maiden name, and Mr. Mueller handled business matters by telephone. Mr. Mueller opened several accounts at Florida banks. On March 13, 1984, Illinois law enforcement officials notified the Orange City, Florida, police department that Mr. Mueller was wanted by the State of Illinois for the theft of $ 280,000. On the same date, an Orange City police officer saw Mr. Mueller leaving the home of Mr. Mueller's former sister-in-law and her husband, the Scotts, in Orange City, Florida. Mr. Mueller saw the police officer and he hid in a nearby woods to avoid being arrested. The police searched the Scotts' home for Mr. Mueller but did not find him. They took Mrs. Scott to the police station for questioning and impounded Mr. Mueller's car, which was parked in the driveway of the Scotts' house. After the police left, Mr. Mueller drove *423 away from the Scotts' home in the Scotts' car. Later, on the same day, Mr. Mueller and petitioner went to the Security First Federal Bank in De Land, where he attempted to withdraw money from an account. A bank teller contacted the De Land Police Department, and the couple left the bank before completing the withdrawal. Approximately 30 minutes later, the police apprehended Mr. Mueller. Petitioner was also taken into custody. The police separated petitioner from Mr. Mueller. Petitioner was found to be carrying 10 to 15 checks totaling approximately $ 100,000 that had been drawn by her husband on different banks. All of the checks were payable to Carolyn Hirsch, petitioner's maiden name. She was also carrying approximately $ 1,000 in cash. Petitioner asked to speak with her husband's lawyer, Mr. Byer, and she declined to answer any questions. After several hours, the police released petitioner, and she returned to the couple's apartment in De Land. Approximately 3 days later, the police interviewed petitioner at the couple's Florida apartment. They asked her about the checks that she was carrying at the time of her detention. Petitioner called Mr. Byer, and he instructed *424 petitioner not to speak to the police and to mail the checks to him. The police officers accompanied petitioner to a nearby post office, where she mailed the checks to Mr. Byer. Two days later, Mr. Mueller returned to the couple's apartment, escorted by two Decatur, Illinois, police officers. Mr. Mueller explained to petitioner that he was returning to Illinois because "his sister wanted him back there." In reality, Mr. Mueller had waived extradition and was being returned to Illinois. At the apartment, Mr. Mueller gathered his belongings and reviewed his mail. In the mail, Mr. Mueller found the couple's 1983 Federal income tax return, which had been prepared by the accounting firm of May, Lambert & King. Mr. Mueller gave the return to petitioner and told her to sign it. After quickly reviewing the return, petitioner signed the return and handed it back to her husband. During July of 1984, Mr. Mueller wrote the following checks, payable to petitioner: Bank Date Amount
Northtown Bank
7/10/84
$ 10,000
Zion Bank
7/11/84
9,000
Zion Bank
7/13/84
15,000
First National Bank
7/13/84
15,000
49,000
Petitioner negotiated each of the above and gave the cash *425 to her husband. On July 13, 1984, at her husband's instruction, petitioner opened a checking account at Milliken National Bank, in Decatur, Illinois. She deposited $ 20,000 of a $ 25,000 check that her husband had given to her to open the account, and she received $ 5,000 in cash. Over the course of the next 10 days, petitioner withdrew $ 19,500 by four separate checks payable to "cash". In each instance, petitioner immediately turned the cash over to her husband. Also during July 1984, petitioner opened a checking account in her name at the First National Bank of Decatur, Illinois, funded with two checks that Mr. Mueller had given to her. Each of the checks was drawn for $ 15,000. Petitioner made an initial deposit of $ 27,000 and received the balance in cash. Within 4 days of opening the account, she withdrew $ 26,000 by writing four $ 5,000 checks and one $ 6,000 check, all payable to "cash". She delivered all of the proceeds to her husband. On October 1, 1984, after trial of the elder Mr. Mueller's suit against petitioner's husband, the State court entered judgment against Mr. Mueller. The court found that Mr. Mueller had breached a fiduciary duty he owed to his father *426 and had obtained $ 250,000 through the use of undue influence over this father. The court gave Mr. Mueller credit for repayment of $ 21,235.70 and credit for $ 15,000, the amount due to Mr. Mueller under the maintenance agreement. The court thus entered a net judgment against Mr. Mueller in the amount of $ 213,764.30. In rendering its judgment against Mr. Mueller, the court noted: That most of the favorable testimony for the defendant [i.e., Mr. Mueller] indicating that the checks were gifts came from the defendant's wife [i.e., petitioner] which the Court finds to be bias, [sic] unbelievable, and unworthy as to any credence.
On March 28, 1985, Mr. Mueller and petitioner filed an amended income tax return for 1983. In the amended return, petitioner and her husband made five changes to their original return. First, they reduced the loss claimed from Mr. Mueller's business, Illinois Auto Recovery, a subchapter S corporation, from $ 24,502 to $ 6,042. This change resulted in an increase of $ 18,460 in the couple's taxable income. Second, they claimed a capital loss of $ 3,000. Third, they reported "other income" from "Rent & Board" of $ 6,184. Fourth, they reported *427 the recapture of an investment tax credit of $ 575. Finally, they adjusted their itemized deductions for medical expenses, charitable contributions, and sales taxes to take into account the first three changes. On the amended return, petitioner and her husband did not report the money that Mr. Mueller had misappropriated from his father, as determined by the State court. In 1986, Mr. Mueller left petitioner and moved to Florida. He filed a petition for divorce, and on June 24, 1987, a Florida court entered an order dissolving their marriage. Petitioner did not retain counsel to represent her in the divorce, and she received no monetary settlement, maintenance, or other support from Mr. Mueller. She did receive her dishes, a microwave oven, a portable television, her engagement ring, and two fur coats. Respondent issued a notice of deficiency to petitioner and Mr. Mueller in regard to their 1983 taxes. The deficiency determined by respondent is based on the following seven adjustments to the taxable income reported on petitioner's 1983 joint return with Mr. Mueller: Notice of
Amended
Deficiency
Return
(a) Unreported income:
interest income
$  1,290 rent and board
15,000 $  6,184 misappropriated funds
213,764 (b) Loss from S corporation
18,460 18,460 (c) Capital loss deduction
<3,000>
<3,000>
(d) Net loss from business --
4,327 disallowed
(e) Excess itemized deductions
4,514 Total
254,355 21,644 *428 Thus, respondent determined an increase of $ 254,355 in petitioner's taxable income. As shown above, three of the adjustments had been reported by petitioner and Mr. Mueller in their amended return. In addition, respondent determined in the notice of deficiency an increase of $ 575 in tax from recomputing the prior year's investment credit. Petitioner and Mr. Mueller had also reported that change in the amended return. Mr. Mueller timely petitioned this Court on behalf of himself and petitioner for redetermination of the deficiency. Thereafter, the Court severed petitioner's case from Mr. Mueller's (docket No. 31528-88). In due course, the Court decided in Mr. Mueller's case that there is a deficiency in income tax due from Mr. Mueller for the 1983 tax year in the amount of $ 95,727, and that there is an addition to the tax under section 6661(a) in the amount of $ 24,457. The Court's decision in Mr. Mueller's case does not impose the negligence addition, but the record in this is case does not explain why. It should also be noted that the decision in Mr. Mueller's case is based upon unreported income received from Mr. Mueller's father in the amount of $ 193,000, rather than *429 $ 213,764, the amount determined in the notice of deficiency. Respondent's posttrial brief in this case makes the following concession: Respondent concedes the differences in tax and additions to tax in his notice of deficiency which exceed those in the Court's decision in Docket No. 31528-88.
OPINION In the subject notice of deficiency, respondent determined that the joint 1983 Federal income tax return filed by petitioner and her former husband understates the couple's gross income by $ 230,054 and overstates certain deductions by $ 24,301. Thus, in the aggregate, respondent determined an increase of $ 254,355 in the taxable income reported on the subject return. Respondent also determined that petitioner and her former husband did not report on their original return an investment credit recapture of $ 575. Petitioner does not question the correctness of respondent's adjustments to her joint 1983 return. The sole issue raised by petitioner is whether she qualifies as an innocent spouse under section 6013(e), and is relieved of joint and several liability for the tax and additions to tax determined by respondent with respect to that return. Section 6013(a) provides *430 that a husband and wife may make a single return jointly of the income taxes imposed under subtitle A of the Internal Revenue Code. Section 6013(d)(3) provides that, if they elect to do so, the tax is computed on the aggregate income of both spouses, and the liability with respect to the tax on the return is joint and several. An exception to the rule imposing joint and several liability in the case of a joint return is found in section 6013(e)(1), which states as follows: SEC. 6013 (e) Spouse Relieved Of Liability In Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then *431 the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
We note that, although the tax year before us is 1983, we apply the statute as amended in 1984. We do this because the Deficit Reduction Act of 1984, Pub. L. 98-369, section 424(a) and (c), 98 Stat. 494, 801-803, retroactively amended section 6013(e) for all open years to which the Internal Revenue Code applies. To qualify as an "innocent spouse" under section 6013(e)(1), a taxpayer must establish that each of the requirements set out therein is satisfied. Rule 142(a), Tax Court Rules of Practice and Procedure. Hereinafter all Rule references are to the Tax Court Rules of Practice and Procedure. Failure to prove any one of those requirements prevents the taxpayer from qualifying as a so-called innocent spouse. E.g., Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). The parties have stipulated that petitioner and her former husband, Mr. Charles F. Mueller, Jr., filed a joint *432 return for 1983. Accordingly, the parties agree that subparagraph (A) of section 6013(e)(1) is satisfied. Section 6013(e)(1)(B) requires a taxpayer to prove that there is a substantial understatement of tax attributable to grossly erroneous items of one spouse. For this purpose, the term "grossly erroneous items" is defined by section 6013(e)(2) to mean, with respect to any spouse: (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.
It is evident that all omissions from gross income are defined as "grossly erroneous items" by section 6013(e)(2). Bokum v. Commissioner, supra at 141. It is also evident that under section 6013(e)(2) a claim of deduction, credit, or basis qualifies as a grossly erroneous item only if "there is no basis in fact or law" for the claim. Id. A claim has no basis in fact or in law if it is "frivolous", "fraudulent", or "phony". Id. at 142. Thus, a spouse is not eligible for innocent spouse status with respect *433 to a claim of deduction, credit, or basis unless the spouse proves that the claim is frivolous, fraudulent, or phony. Id.
In this case, respondent made eight adjustments to petitioner's 1983 joint return in the subject notice of deficiency. Three of the adjustments involve items of income that were omitted from the gross income reported on the return: Interest income
$   1,290
Rent and board
15,000
Funds misappropriated
213,764
Total
230,054
The above items of omitted income qualify as grossly erroneous items under section 6013(e)(2). As to the above three adjustments, therefore, section 6013(e)(1)(B) is satisfied. We note that respondent concedes that the amount of the funds misappropriated from Mr. Mueller's father is $ 193,000, rather than $ 213,765. The remaining five adjustments made by respondent in the notice of deficiency involve deductions and the recapture of investment credit, as follows: Loss from S corporation
$ 18,460 Capital loss deduction
<3,000>
Net loss from business
4,327 Excess itemized deductions
4,514 Investment credit recapture
575 Petitioner has presented no evidence from which we can conclude that the claims for the *434 above deductions and credit were frivolous, fraudulent, or phony. Accordingly, petitioner has failed to prove that the above items constitute "grossly erroneous items" of Mr. Mueller under section 6013(e)(2). As to these adjustments, section 6013(e)(1)(B) is not satisfied. Under section 6013(e)(1)(C), petitioner must prove that in signing the return, she did not know, and had no reason to know, of the substantial understatement of tax attributable to Mr. Mueller's omission from gross income of the three items described above. See, e.g., Purcell v. Commissioner, 86 T.C. 228, 236 (1986), affd. 826 F.2d 470 (6th Cir. 1987). This is a question of fact to be determined after considering all available facts and circumstances. See, e.g., Flynn v. Commissioner, 93 T.C. 355, 365 (1989). Petitioner must establish that she had no knowledge of the transactions leading to the understatement, not simply that she had no knowledge of the understatement itself. E.g., Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); *435 McCoy v. Commissioner, 57 T.C. 732, 734-735 (1972). If we find that petitioner knew of the transaction that gave rise to the omitted income, the benefits of the innocent spouse provision are unavailable. Purcell v. Commissioner, supra at 238; Smith v. Commissioner, 70 T.C. 651, 672-673 (1978); McCoy v. Commissioner, supra at 734. In Quinn v. Commissioner, supra at 626, the court stated: "The knowledge contemplated by the statute is not knowledge of the tax consequences of a transaction but rather knowledge of the transaction itself." Further, in McCoy v. Commissioner, supra, this Court stated: we do not think section 6013(e) was designed to abate joint and several liability where the lack of knowledge of the omitted income is predicated on mere ignorance of the legal tax consequences of transactions the facts of which are either in the possession of the spouse seeking relief or reasonably within his reach. [Id. at 734.]
In this case, when *436 petitioner signed the subject return, she knew that Mr. Mueller had received a large amount of money from his father. Between July 1983 and October 1983, petitioner witnessed the senior Mr. Mueller giving his son checks worth at least $ 190,000. She found other checks from the elder Mr. Mueller on her husband's desk. There is evidence from which we infer that Mr. Mueller and petitioner went to Florida to avoid service of the complaint in the elder Mr. Mueller's lawsuit and possibly to avoid criminal prosecution for the theft of the elder Mr. Mueller's funds. In December 1983, petitioner accompanied Mr. Mueller when he abruptly decided to take an extended trip to Florida. This trip commenced shortly after the senior Mr. and Mrs. Mueller had left petitioner's home, and after the elderly couple and their daughter had begun to demand that Mr. Mueller return his father's funds. Before this trip, petitioner and her husband had never vacationed for more than 2 weeks at a time. During this trip, petitioner and Mr. Mueller first stayed with petitioner's parents in Winter Haven and then went to another town, De Land, where they rented an apartment. They also rented a post office box *437 in petitioner's maiden name, and Mr. Mueller used the post office box to receive mail from his Illinois-based automobile repossession business. Furthermore, there is evidence in the record that petitioner was Mr. Mueller's willing accomplice in his attempt to abscond with the money that he had misappropriated from his father. For example, at the time petitioner was detained and questioned by the Orange City, Florida, police, she was carrying $ 100,000 in checks written from her husband to her maiden name. She was also carrying $ 1,000 in cash. Up to that point in their 3-year relationship, Mr. Mueller had never allowed petitioner access to any bank accounts, and the most money that he had ever given her was a $ 100-per-month allowance. A few days after petitioner was released from custody, law enforcement officials arrived at the couple's Florida apartment and questioned her about the $ 100,000 in checks in her possession on the day of her detention. After consulting with her husband's attorney via telephone, petitioner refused to answer any questions and mailed the checks to the attorney. Five days after his arrest, Mr. Mueller returned to the couple's apartment accompanied *438 by two Decatur, Illinois, police officers. Mr. Mueller opened his mail and found the couple's joint 1983 return, which had been prepared by Mr. Mueller's accountant. After reviewing the return, petitioner signed it. Given the events that had transpired to that point, we cannot find that petitioner signed the return without any knowledge of her husband's misdeeds. Petitioner argues that she knew nothing of her husband's dealings with his father. She claims that she believed Mr. Mueller's explanations and did not question him because "He was my husband. I did anything that he wanted me to do, that he told me to do." However, a spouse may not close her eyes to facts that might give her reason to know of unreported income. Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); see also Stevens v. Commissioner, 872 F.2d 1499, 1505-1506 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part, revg. in part and remanding T.C. Memo. 1984-310. Petitioner maintains that she believed *439 the checks from her father-in-law were gifts and thus were nontaxable receipts. However, for the reasons set forth above, we give no credence to petitioner's testimony on that point. Petitioner further argues that her lack of involvement in the couple's financial affairs, the absence of lavish expenditures, her husband's deceit, and her level of education should shield her from liability in this case. See Stevens v. Commissioner, supra at 1505. However, petitioner has offered nothing to refute the evidence in the record that she witnessed key events and abetted her husband in his misappropriation. Petitioner has presented no evidence and has made no argument specifically dealing with either of the other items of omitted income determined by respondent, interest income of $ 1,290, and rent and board of $ 15,000. Accordingly, petitioner has failed to prove that she is an innocent spouse under section 6013(e) as to either of those adjustments. Petitioner has also presented no evidence and has made no argument regarding respondent's determination that she is liable for the addition to tax under section 6661(a). Accordingly, we sustain respondent's *440 determination of the addition to tax under section 6661(a). To reflect the concessions made by respondent, Decision will be entered under Rule 155.